IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:17-CR-002** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **MIGUEL SCOTT ARNOLD** | : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

Before the court is Defendant Miguel Scott Arnold's motion for judgment of acquittal and alternatively a new trial. (Doc. 220.) The government has responded, and the matter is ripe for review. For the reasons set forth below, the court will deny the motion.

I.     **Background**

On January 4, 2017, a grand jury in the Middle District of Pennsylvania returned a six-count indictment against Arnold and his co-defendants Terrance Hawkins, Tevin Bynoe, Emonie Murphy, and Joshua Guity-Nunez. The indictment charged all defendants with (1) Criminal Conspiracy, Sex Trafficking by Force, Fraud and Coercion in violation of 18 U.S.C. § 1594(c) (Count One); (2) Sex Trafficking by Force, Fraud, and Coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1) (Count Two); (3) Criminal Conspiracy, Possession with Intent to Distribute Heroin and Marijuana in violation of 21 U.S.C. § 846 (Count Four); (4) Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841(a)(1) (Count Five);

1

and (5) Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. § 841(a)(1) (Count Six).

On June 17, 2019, Arnold alone proceeded to trial. (Doc. 234.) The trial spanned five days, during which the jury heard from multiple of Arnold's co-defendants and victims. On June 21, 2019, after the conclusion of the trial, the jury convicted Arnold on Counts One, Two, Four, and Five, and acquitted him on Count Six. Arnold now moves for judgment of acquittal and alternatively a new trial with respect to his convictions on Counts One, Two, and Four.

a. Trial Testimony

At trial, the jury heard from various of Arnold's co-defendants that are charged in the indictment, including Bynoe, who pled guilty to Count Two and testified pursuant to a proffer agreement. Bynoe testified that he met Arnold in 2014 when Arnold was visiting New York City. (Transcript of Proceedings (hereinafter "Tr."), Docs. 229-231, 234, p. 271.) Around one year later, upon returning to New York City, Arnold contacted Bynoe to ask him whether Bynoe knew of any females that would be interested in commercial sex work. (*Id*., pp. 274-75.) In the ensuing weeks, Bynoe connected Arnold with multiple females that Arnold brought back to Pennsylvania to engage in commercial sex work. (*Id*., pp. 282, 284, 286.)

In late 2015, Bynoe moved to Harrisburg, Pennsylvania. (*Id*., p. 287.) There, he made an agreement with Arnold to drive him and his female victims to

"prostitution dates" ("dates") in exchange for compensation. (*Id.*, p. 288.) Before long, Bynoe himself began prostituting women at Arnold's direction and with Arnold's assistance. (*Id.*, pp. 290, 295.) Arnold taught Bynoe things such as where to advertise and how to use Bitcoin. (*Id.* p. 290.) Thereafter, Bynoe and Arnold mostly had separate and distinct victims, though they operated out of the same hotels and townhouses, recruited females together, supervised each other's victims when the other was unavailable, and would sometimes send their victims to the same dates when a john requested two females. (*Id.*, pp. 290, 295, 302-33, 307-11, 314.) They also utilized each other and their other co-defendants as drivers, including Guity-Nunez and Hawkins. (*Id.*, p. 303.). Sometimes, females would switch between working under the two men. (*Id.*, p. 334.)

Bynoe testified that marijuana was among the expenses for the business and that he distributed marijuana to his victims and the other participants in the business, including the drivers. (*Id.*, p. 306.) He also explained that some of the females under him and Arnold were drug addicts, and that he observed Arnold provide heroin to females. (*Id.*, p. 335-36.) Bynoe noted that when Arnold would buy heroin, he "used to go for a ride to get weed as well." (*Id.*, p. 335.)

Bynoe testified that he saw Arnold use violence towards his female victims on three occasions, including one time when Arnold slapped the back of a female's head because she quoted the wrong price to a john. (*Id.*, pp. 307, 317-18.) On another

occasion, there was some confusion about whether a particular female was going to work directly under Bynoe or Arnold, and when the female informed Arnold that she wanted to work under Bynoe because Arnold was mean, Arnold slapped her. (*Id.*, p. 328.) Bynoe also testified that in mid-2016, one of his female victims that owed him money switched to working for another pimp, Sonny Banks. After Banks refused to pay Bynoe the money that the female owed, Bynoe, Arnold, Hawkins, and Guity-Nunez beat and robbed Banks. (*Id.*, pp. 340-41.)

The jury also heard testimony from Murphy, who like Bynoe was charged in the indictment as a co-conspirator to Arnold, pled guilty to Count Two, and testified pursuant to a proffer agreement. Murphy testified that in late 2015, she began working as a commercial sex worker directly under Bynoe and would go on three to five dates per day. (*Id.*, pp. 103, 108.) She thereafter became Bynoe's "bottom," a term given to a pimp's lead prostitute that is akin to the pimp's second in command. (*Id.*, p. 163.)

Murphy testified that Bynoe and Arnold had a close relationship and interacted on a regular basis, including speaking about sex trafficking "[a] lot. Maybe 80 percent, 90 percent of the time." (*Id.*, pp. 129-32; 136.) Her testimony made clear that Arnold and Bynoe worked out of the same hotel, recruited together, and sent their victims on the same dates and provided them with the same instructions. (*Id.*, pp. 128-31.) Murphy testified that females were driven to dates by

Arnold, Bynoe, Guity-Nunez, Hawkins, and herself. (*Id*., pp. 120-23.) She also testified that when Arnold was unavailable, she herself would look over Arnold's victims. (*Id*., p. 141.) On one occasion, when Bynoe was in jail, Arnold came and "intimidated" two commercial sex workers that were initially recruited by Hawkins, and then working under Murphy, because Murphy was concerned they wouldn't listen to her:

> He was yelling at them saying that, you know, I'm trying to help [Bynoe and Murphy] out, so don't talk to me the way you want to talk to me or like don't talk to me like that, don't be disrespectful to me, I'm trying to help them make money, and if there's any issues, I'll be coming back. And then he said that if I had any problem, to call him and he'll handle it.

(*Id*. pp. 168-69; *see also* p. 167.)

Several victims of Arnold and his co-conspirators also testified. For example, Brianna Mercier testified that she met Arnold in Summer 2016 when she was walking to McDonald's and Arnold and another man pulled up in a car. (*Id*., p. 463.) At the time, Mercier was around 21-years old with a ninth-grade education, and she was suffering from anxiety, depression, and a heroin addiction. (*Id*., pp. 458-59.) Soon after meeting Arnold, Mercier explained to him that she needed money because she recently lost her job and was evicted, and needed heroin because she was experiencing withdrawal symptoms. (*Id*., p. 464.) Arnold responded that he could advertise her on the internet as a commercial sex worker, split the proceeds with her down the middle, and provide her with heroin after she went on a date. (*Id*., pp. 466-

70.) Mercier obliged and provided Arnold with half the proceeds, and Arnold provided Mercier with heroin. (*Id.,* pp. 470-71, 475.)

Mercier testified that she witnessed Arnold use violence on two occasions. One time, Arnold became "very angry" that one of his female victims spent extra time with a john without being compensated. (*Id.,* pp. 476-77.) In response, Arnold put his hands around the female's neck. (*Id,* p. 477.) Mercier testified that she herself "froze" upon witnessing this violence, and that the female victim reacted with fright "like anybody would." (*Id.,* p. 478-79.) Mercier also testified that on another occasion—under "the same circumstances, spending too much time with a client, not getting enough money"—she witnessed Arnold slap the face of another of his female victims. (*Id.,* pp. 479-80.)

Nicole Bailey, another of Arnold's victims, also testified. Bailey said that in Summer 2016, she was approached by Murphy and another man while she was standing outside a store and suffering from heroin withdrawal. After meeting, Murphy set up dates for Bailey. After one week of commercial sex work, she was introduced to Arnold, who told that her that she was expected to make $1000 in one night. (*Id.,* p. 508.)

Arnold also explained to Bailey that she could choose to have a 50/50 or "all in" arrangement with him. (*Id.*) Under a 50/50 arrangement, Arnold and Bailey would each keep half of the proceeds from each date. (*Id.*) Under an "all in"

arrangement, all the money would go to Arnold in exchange for Arnold taking care of all of Bailey's needs including food, transportation, lodging, and drugs. (*Id*.) Bailey testified that she decided to be "all in," and that Arnold told her that the arrangement would include him providing her with heroin. (*Id*., p. 509.) Bailey testified that she did in fact receive heroin from Arnold, Guity-Nunez, and Murphy. (*Id*., pp. 509-10, 512.) On some occasions, heroin was withheld from her (and other victims) until after she went on dates. (*Id*., p. 513; *see* pp. 137, 160.)

Bailey also testified that she was driven to dates by Arnold and Guity-Nunez, and that when johns would come to her for dates, Arnold and Guity-Nunez would instruct her to stay inside her hotel room for fear of getting caught. (*Id*., pp. 512, 514.) Bailey testified that she once witnessed Arnold raise his hand to another female but "didn't hear it connect." (*Id*., p. 514.) Bailey also testified that she allowed Arnold to rent various hotel rooms that were used for sex trafficking in her name because she "didn't want to say no, you know, due to what could happen for saying no." (*Id.,* p. 515.)

Shanita Jones was another witness. Jones testified that in late 2015, when she was around 20 years old, Bynoe approached and exchanged telephone numbers with her as she was walking into a store. (*Id*., pp. 181-83, 185-86.) A few days later, Bynoe drove Jones to Arnold's house, where Arnold and Bynoe recruited Jones by telling her about the vast sums of money she could make as an escort. (*Id*., p. 183-

86.) Soon after, Jones agreed to work as a prostitute directly under Bynoe, and she began going on around three to five dates per day, seven days per week. (*Id.*, p. 196.) She was driven to the dates by Arnold and Hawkins. (*Id.*, p. 194.) Jones described Bynoe as a subservient business partner to Arnold:

> Q.  Did you see [Bynoe] working with anyone in his prostitution sex trafficking business?
>
> A.  He was working with [Arnold].
>
> Q.  In what way was Tevin Bynoe working with [Arnold?]
>
> A.  They were kind of like partners. But they talked, they talked together a lot. But if [Arnold] would tell him to do something, it was done. Like there was no questions. He didn't think twice about. It was done.

(*Id.*, p. 193.)

Jones also testified about an event in which she and others were tasked with "training" one of Arnold's victims, an underage pregnant female, on how to prostitute. (*Id.*, p. 205.) According to Jones, she and Murphy witnessed Arnold and Bynoe violently assault this female by repeatedly slapping her face "so hard, she stumbled to the side." (*Id.*, p. 208.) Jones also testified that immediately after the incident, as she and Murphy were attempting to assist and "clean…up" the female, she could overhear the following conversation between Arnold and Bynoe:

> And you hear them saying how she can't be trusted and how they have to get rid of her and how they were thinking about stripping her naked, putting her in the trunk of the car, driving somewhere, and just shoving her out and leaving her there. They said they couldn't do that because

she would have told someone already everything what was going on and they had to get rid of her.

(*Id.*, p. 209.)

Jones further testified that she was given various tasks to help run the sex trafficking operation, including paying the drivers and buying condoms and marijuana. (*Id.*, p. 190.) When asked where the marijuana came from, Jones testified it was "one of the things that came out of our money, was for us to buy it, because pretty much all of us, all of us were smoking. So we were all paying for and coming out-of-pocket for it." (*Id.*, p. 192.)

Tiffany Ogden, another of Arnold's victims, also testified. Ogden testified that she worked under Arnold pursuant to an "all in" arrangement, and that she was driven to dates by Guity-Nunez and others. (*Id.*, pp. 232-33.) Ogden testified that she witnessed Arnold direct violence toward women on three or four occasions. (*Id.*, p. 234.) On one occasion, Ogden witnessed Arnold grab another of his female victims "by the back of her neck, and walk[] her into the bathroom and shut the door" because she was supposedly being loud at the time. (*Id.*) After a couple minutes, Arnold "walked out and said, you won't hear nothing from her again for the rest of the night." (*Id.*, pp. 234-35.) Ogden also testified that on another occasion, she, Arnold, and the same female were eating in a car when Arnold's phone rang. (*Id.*, p. 235.) Arnold attempted to hand the phone to the female, who was not paying attention, and the call was missed by the time the female tried to answer. (*Id.*, p.

236.) In response, Arnold exited and walked around the car to where the female was sitting and "grabbed her by her neck, put her neck in between her knees—her head in between her knees and started screaming about the fact that, you're losing our money, don't you ever do it again." (*Id*.) Arnold then "let her go" and got back in the car. (*Id*.)

## II.    <u>Standard of Review</u>

Under Rule 29 of the Federal Rules of Criminal Procedure, the central question in deciding a motion for acquittal is whether, "viewing all the evidence adduced at trial in the light most favorable to the government, a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Harmon*, 681 F. App'x 152, 155 (3d Cir. 2017) (citing *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993)). "A defendant challenging the sufficiency of the evidence pursuant to Rule 29 bears a heavy burden." *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (quoting *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992)). "The decision to overturn a conviction based on insufficient evidence may only be made where the prosecution's failure is clear, or where the verdict falls below the threshold of bare rationality." *United States v. Delgado*, 367 F. Supp. 3d 286, 291 (M.D. Pa. 2019) (internal quotation marks and citations omitted). "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of

the evidence challenges." *United States v. Garner*, 915 F.3d 167, 169 (3d Cir. 2019) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013)).

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). "However, even if the court believes that the verdict is contrary to the weight of the evidence it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred— that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Johnson*, 302 F.3d at 150).

A new trial should only be granted sparingly and in exceptional situations. *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008); *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). Exceptional situations include those in which trial errors, "either individually or in combination, 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993); *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719-20 (E.D. Pa. 2009).

## III.   **Discussion**

### a.   The court will not disturb the jury's verdict on Count One.

Arnold moves for acquittal and alternatively a new trial for his conviction on Count One of the indictment, Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion in violation of 18 U.S.C. § 1594(c). He argues that the evidence at trial failed to prove a single overarching conspiracy as alleged in the indictment and instead only proved multiple conspiracies, and that the variance between the indictment and evidence at trial was prejudicial.

An impermissible variance exists where "a single conspiracy is alleged in an indictment, and the evidence at trial merely proves the existence of several distinct conspiracies[.]" *United States v. Lee*, 359 F.3d 194, 207 (3d Cir. 2004). "On the other hand, a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies and, therefore, would not create an impermissible variance." *Id.* A variance results in reversible error only if it is likely to have surprised or prejudiced the defendant. *United States v. Daraio*, 445 F.3d 253, 262 (3d Cir. 2006). To prevail, the defendant must show that "there was at trial a variance between the indictment and the proof," and that "the variance prejudices a substantial right of the defendant." *United States v. Miller*, 527 F.3d 54, 69 (3d Cir. 2008).

In *United States v. Kelley,* 892 F.2d 255, 259 (3d Cir. 1989), the Third Circuit outlined three factors that courts should consider in determining whether the evidence at trial established a single conspiracy or multiple conspiracies. First, the court considers whether there was a common goal among the conspirators. *Id*. Second, the court considers "whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirator." *Id.* (internal quotation marks and citations omitted). For this factor, the court looks to "whether there was evidence that the activities of one group were necessary or advantageous to another aspect of the scheme or to the overall success of the venture." *Gandy*, 510 F. App'x at 166 (citations omitted). Third, the court considers the extent to which the participants overlap in the various dealings. *Kelly*, 892 F.2d at 259.

"The government need not prove that each defendant knew all the details, goals, or other participants" in order to show the existence of a single overall conspiracy. *United States v. Padilla*, 982 F.2d 110, 114 (3d Cir. 1992); *see United States v. Ha Ngo*, 451 F. App'x 220, 225 (3d Cir. 2011). Additionally, "[a] defendant cannot demonstrate the existence of a variance merely by proving that a master conspiracy encompassed distinct sub-schemes; sub-schemes that are related in support of the overall illegal scheme are not independent conspiracies." *United States v. Rodriguez*, 726 F. App'x 136, 142 (3d Cir. 2018) (citing *Perez*, 280 F.3d at

346.) "Accordingly, proof of interdependence among coconspirators serves as evidence of an agreement that helps establish whether the alleged coconspirators are all committed to the same set of objectives in a single conspiracy." *Id.* (internal citations and quotation marks and brackets omitted). "[W]hile the Kelly factors are useful to demonstrate the existence of a single conspiracy, 'the absence of one factor does not necessarily defeat an inference of the existence of a single conspiracy.'" *Ha Ngo*, 451 F. App'x at 224 (quoting *Padilla*, 982 F.2d at 115).

Here, the first *Kelly* factor is met because there was a clear common goal among Arnold and his co-defendants to traffic women for commercial gain. The second factor is also satisfied because Arnold and his co-defendants were advantageous to another aspect of the scheme or to the overall success of the venture. Their sex trafficking operation depended on a steady of stream of female recruits, a constant pool of available drivers, and ongoing supervision and exercise of control over female victims—and the evidence at trial showed that each of the co-defendants filled these roles on a rotating basis. Finally, the third *Kelly* factor is also met because the jury heard evidence of extensive overlap between the co-defendants' operations. Arnold and his co-conspirators frequently congregated and participated in sex trafficking together. Victims characterized Arnold and Bynoe as business partners, with Murphy operating just underneath Bynoe, and Guity-Nunez acting as a dedicated driver for all the defendants. In addition to Guity-Nunez, all other

defendants drove each other and their respective victims to dates. There was also significant overlap in the recruitment and supervision of female victims—Bynoe recruited for Arnold; Arnold and Hawkins helped recruit for Bynoe and Murphy; and Murphy trained and supervised victims of Bynoe and Arnold, who returned the favor by threatening Murphy's victims to stay in line when Bynoe was in jail. Moreover, all defendants consistently operated together out of the same locations and even caused their victims to perform commercial sex acts together. The evidence at trial was therefore sufficient to satisfy the *Kelly* factors and prove the existence of a single overarching conspiracy.

Finally, even if Arnold could demonstrate a variance, he cannot show the requisite prejudice needed to overturn the jury's verdict. In his closing argument, Arnold's counsel argued that the government merely proved the existence of multiple conspiracies at trial. Accordingly, the court instructed the jury on how to differentiate between a single overarching conspiracy and multiple conspiracies. (Doc. 241, pp. 78-80.) It also instructed the jury that if the government failed to prove Arnold's participation in the conspiracy as charged in the indictment, "then you must find the Defendant not guilty of that conspiracy, even if you find that there were multiple conspiracies and that the Defendant was a member of a separate conspiracy other than the one charged in the indictment." (*Id.*, pp. 78-79.) This instruction was sufficient to "dispel the concerns of prejudice" that Arnold raises in

his motion. *United States v. Perez*, 280 F.3d 318, 347 (3d Cir. 2002); *see United States v. Solomon*, 387 F. App'x 258, 262 (3d Cir. 2010) ("Not only was the evidence more than sufficient to prove a single conspiracy, but the jury charge included an instruction on single versus multiple conspiracies, curing any potential defect.") (citing *Perez*). Thus, the court finds that the jury's verdict on Count One was based on sufficient evidence.

In addition, the jury's verdict on this count was not against the weight of evidence and the court will not order a new trial. In the court's judgment, the aforementioned evidence at trial was compelling and made clear that Arnold stood atop of a vast overarching sex trafficking conspiracy in which all the co-defendants had a mutual understanding and played a significant role—often at Arnold's express direction or with his direct oversight. The court finds no risk that Arnold is not guilty on this count, and justice does not require a new trial.

b. The court will not disturb the jury's verdict on Count Two.

Arnold also moves for acquittal and alternatively a new trial for his conviction on Count Two of the indictment, Sex Trafficking by Force, Fraud, and Coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1).[1] A defendant commits this offense if he knowingly, in or affecting interstate commerce, "recruits, entices, harbors,

---

[1] During his closing argument, Arnold's attorney conceded to the jury that the government proved beyond a reasonable doubt that Arnold was guilty of this count.

transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person…knowing, or…in reckless disregard of the fact, that means of force, threats of force, fraud, coercion…or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C.A. § 1591(a).

Punishment under the statute carries a mandatory minimum of 15 years imprisonment "if the offense was effected by means of force, threats of force, fraud, or coercion." *Id.* § 1591(b)(1). The statute defines coercion as (1) "threats of serious harm to or physical restraint against any person;" (2) "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person"; or (3) "the abuse or threatened abuse of law or the legal process." *Id.* § 1591(e)(2). "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(4).

Here, Arnold argues that the evidence presented at trial was insufficient to show that he engaged in sex trafficking "by means of force, threats of force, fraud, or coercion," and that the jury's verdict was against the weight of evidence, because those witnesses that testified did not experience his violence and threats firsthand,

but rather only observed them. However, the use of violence and threats in the presence of others can constitute "coercion" under the statute. *See United States v. McIntyre*, 612 F. App'x 77, 79 (3d Cir. 2015); *United States v. Williams*, 714 F. App'x 917, 919 (11th Cir. 2017). The testimony at trial showed that on several occasions, Arnold responded to threats to his sex trafficking activities—getting caught, missing calls from clients, losing money or victims, and not being compensated for time spent between a victim and client—by exposing and subjecting his victims to serious physical violence and threats. A jury could have thus concluded beyond a reasonable doubt that Arnold's victims, many of whom were young, desperate, and impressionable, reasonably feared that they would be subject to serious physical harm if they did not continue their prostitution activities. This is sufficient to meet the definition of coercion under the statute.

In addition, the evidence also showed that Arnold directly and intentionally exploited the heroin addictions and withdrawal symptoms of some of his victims by withholding heroin from them until they went on dates. A jury could have determined from this evidence that Arnold effected his sex trafficking activities through coercion by exploiting the drug addictions of victims to compel them to engage in commercial sex acts in order avoid serious psychological and physical harm. This is also sufficient to meet the definition of coercion under the statute. *See United States v. Mack*, 808 F.3d 1074, 1081 (6th Cir. 2015); *United States v. Fields*,

625 F. App'x 949, 952 (11th Cir. 2015); *United States v. Shine*, No. 17-CR-28, 2019 WL 6838623, at *5 (W.D.N.Y. Dec. 16, 2019). The jury's verdict on this count was therefore based on sufficient evidence.

In addition, the verdict was not against the weight of evidence and a new trial will not be ordered. As discussed above, the jury heard extensive, uncontradicted evidence from victim after victim about the violence that Arnold regularly used in carrying out his sex trafficking activities and, in the court's view, there is no danger that a miscarriage of justice has occurred. The court therefore will not disturb the jury's verdict on Count Two.

    c.  <u>The court will not disturb the jury's verdict on Count Four.</u>

Arnold also challenges the jury's guilty verdict on Count Four for conspiracy to possess with intent to distribute heroin and marijuana, arguing that the verdict was based on insufficient evidence and alternatively against the weight of evidence. "To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (citation omitted). The government must prove each element beyond a reasonable doubt, through direct or circumstantial evidence. *Id.*

Here, Arnold concedes that he possessed and distributed heroin but argues that the evidence was insufficient to show that he entered into a conspiracy with

others to do so. The evidence at trial showed that as part of their sex trafficking activities, Arnold and some of his co-conspirators provided at least some of his victims with heroin on a daily basis, in exchange for those victims going "all in" and providing Arnold with all of the money they received from their commercial sex work. Murphy and Guity-Nunez, the dedicated driver for the operation, were among these co-conspirators. In fact, when one victim was asked by the government who decided when she was to receive heroin, she lumped all three co-conspirators together: "Just whoever would give us the heroin that day." (Tr., p. 513.) Another victim that testified to receiving heroin on a daily basis similarly noted that it would be "delivered to my hotel room." (*Id*., p. 476.) Consistent with this testimony, another victim testified that Arnold enlisted the help of others in helping her to obtain heroin every day. (*Id*., pp. 546-50.) This evidence, taken together, is sufficient to show that Arnold worked in concert with his co-defendants to distribute heroin to his victims—a shared unity of purpose. From this conduct, a rational jury could have found that Arnold intentionally entered into an agreement with his co-conspirators, and particularly with Guity-Nunez and Murphy, in furtherance of that objective. The evidence was therefore sufficient to find that Arnold conspired to possess and distribute heroin.

There was also sufficient evidence at trial for the jury to find beyond a reasonable doubt that Arnold conspired to possess and distribute marijuana. Jones

testified that "pretty much all" of the other commercial sex workers had compensation withheld from them and were provided with marijuana instead. (Tr., p. 192.) She also testified that when she had the first date of the night, it was her job to go out and purchase the marijuana for the business. (*Id.*, p. 190.) Bynoe similarly testified that marijuana would be purchased and distributed to victims and others that participated in the commercial sex work operation, including the drivers. (*Id.*, p. 306.) Bynoe also testified that he purchased the operation's marijuana when he was with Arnold. (*Id.*, p. 335.) From this evidence, circumstantial as it may be, a reasonable jury could have found that Arnold, who played a central role at the top of the sex trafficking business, intentionally entered into an agreement with his co-conspirators to possess and distribute marijuana.[2] The evidence was therefore sufficient to sustain the jury's guilty verdict on this count.

Even without considering this evidence in a light most favorable to the government, the jury's verdict on this count was not against the weight of evidence

---

[2] The evidence also showed a single conspiracy to possess and distribute heroin and marijuana rather than multiple conspiracies. The first *Kelly* factor is met because there was a clear shared unity of purpose to distribute marijuana and heroin for commercial gain. The second and third *Kelly* factors are also well satisfied because all the pertinent activities of the co-conspirators overlapped and were advantageous to the overall success of the scheme. The relevant evidence at trial solely or predominantly regarded those efforts by Arnold and his co-conspirators to purchase, deliver, and sell heroin and marijuana to Arnold's victims by withholding money from their commercial sex activities. There was no evidence of any separate scheme. Finally, assuming for the sake of argument that the evidence did fail to show a single overarching conspiracy to possess and distribute marijuana and heroin and instead only proved multiple conspiracies, the court cannot discern any prejudice that would stem from such variance, and Arnold's conviction on Count Four would still be sustained.

and a new trial is not appropriate. The aforementioned testimony by multiple of Arnold's co-defendants and victims showed a clear understanding and agreement whereby money was regularly withheld from Arnold's victims in exchange for Arnold and his-conspirators providing them with marijuana and heroin. Several of Arnold's co-defendants, including Murphy, Bynoe, and Guity-Nunez, played various roles in working to achieve this common goal. In the court's view, having presided over Arnold's five-day trial, the evidence forecloses any significant risk that the defendant is not guilty of Count Four and demonstrates that this is not among those "exceptional cases" in which a new trial is appropriate. *Brennan*, 326 F.3d at 189. The court therefore will not disturb the jury's verdict on Count Four.

## IV. <u>Conclusion</u>

For the reasons explained above, the court will deny Arnold's motion for acquittal and alternatively a new trial. An appropriate order shall follow.


*/s/ Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: February 10, 2020